WILLIAM JHAVERI-WEEKS (SBN 289984)
wjw@jhaveriweeks.com
SARAH ABRAHAM (SBN 326098)
sa@jhaveriweeks.com
ALLY N. GIROUARD (SBN 336625)
ag@jhaveriweeks.com
THE JHAVERI-WEEKS FIRM, P.C.
351 California Street, Suite 700
San Francisco, CA 94104
Telephone: (415) 463-8097
Facsimile: (415) 367-1439

JULIAN HAMMOND (SBN
jhammond@hammondlawpc.com
POLINA BRANDLER (SBN
pbrandler@hammondlawpc.com
ARI CHERNIAK (SBN
acherniak@hammondlawpc.com
HAMMONDLAW, P.C.
1201 Pacific Ave, 6th Floor
Tacoma, WA 98402
Telephone: (310) 601-6766
Facsimile: (310) 295-2385

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| EDGAR OGANESYAN, individually and on behalf all others similarly situated, | Case No. |
| Plaintiff, | **COMPLAINT FOR DAMAGES** |
| v. | **JURY TRIAL DEMANDED** |
| RAKUTEN USA, INC.; EBATES PERFORMANCE MARKETING, INC. d/b/a RAKUTEN REWARDS, | |
| Defendants. | |

Plaintiff Edgar Oganesyan ("Plaintiff") brings this Class Action Complaint, on behalf of himself and all other similarly situated social media influencers, bloggers, and other content creators, against Rakuten USA, Inc. and Ebates Performance Marketing, Inc. (collectively, "Defendant" or "Rakuten") for wrongfully and surreptitiously stealing their rightfully earned affiliate marketing commissions through the use of Defendant's Rakuten browser extension. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and as to all other matters, upon information and belief, including investigation conducted by his attorneys:

## INTRODUCTION

1.      Affiliate marketing is a powerful and popular tool used by online merchants across various industries, including retail, technology, software, health and wellness. It is a type of online marketing that involves a partnership between businesses (online merchants) and individuals or companies (social media influencers, bloggers, and other content creators). The popularity of the affiliate marketing strategy stems from the fact that it is both an effective and cost-efficient strategy that drives sales by leveraging the reach and credibility of social media influencers, bloggers, and other content creators ("affiliates" or "Creators").  Instead of having to invest in costly marketing campaigns, merchants pay only when results are achieved (*i.e.*, products are sold). Creators promote the merchant's products on their social media platforms that they have built over time, such as YouTube channels, Instagram, or TikTok accounts, or blogs, and merchants pay them commission for the products sold through their promotional efforts.

2.      Affiliate commissions (also known as referral fees) are tracked through unique affiliate links. These links are provided by the online merchants (or third-party affiliate networks who facilitate the process) to the Creators, who then post them on their social media platforms. The affiliate links contain a code unique to the Creator (an affiliate ID and the coupon code), *i.e.*, affiliate source information. When a consumer clicks the affiliate link on the Creator's platform and arrives on the merchant's website, the code unique to the Creator is saved in a cookie on the consumer's browser. When the consumer completes a purchase, the Creator's unique information contained in the cookie is sent to the merchant, identifying the Creator as the one responsible for

the sale, and allowing the merchants to accurately attribute the sale to the specific Creator and to pay the Creator a commission/referral fee.

3.    In December 2024, MegaLag, a YouTuber known for his tech investigations, exposed a commission scam by PayPal's Honey browser extension. PayPal advertised Honey as a tool to save consumers money by searching for coupons on the internet and applying those coupons to the consumer's transaction.  However, when consumers clicked on the "Apply Coupon" on the Honey pop-up, Honey manipulated the affiliate cookie by deleting the Creator's unique information and injecting source code with its own information. As a result, when consumers completed their purchases, it looked like the sale was attributable to Honey, not the Creator, and the merchant sent the commission to Honey instead of the Creator whose efforts led to the sale.[1]

4.    This exposé by MegaLag spurred investigations into other coupon extensions that led to the discovery of similar commission diversion scams, including by the Defendant via its Rakuten browser extension.

5.    Rakuten markets its browser extension as a savings and coupon-hunting tool for consumers, but when a consumer uses the Rakuten extension to purchase an item, Defendant manipulates any affiliate cookie by deleting the Creator's unique information and replacing it with source code with Rakuten's information, thus diverting commissions to itself.

6.    Plaintiff brings this class action lawsuit, individually and on behalf of all other similarly situated Creators, against Defendant for Defendant's deceptive, unfair, and unlawful practice of stealing affiliate marketing commissions from Creators via the Rakuten browser extension, seeking damages, restitution, injunctive, declaratory, and other equitable relief, pursuant to the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq*., Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*., California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*., California's Invasion of Privacy Act, Cal. Penal Code § 630 *et seq*., California's Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502, and counts for conversion, unjust enrichment, and intentional interference with prospective economic advantage.

---

[1] MegaLag, Exposing the Honey Influencer Scam, YouTube (Dec. 21, 2024), https://www.youtube.com/watch?v=vc4yL3YTwWk&t=389s

## PARTIES

7.      Plaintiff Edgar Oganesyan is, and has been at all relevant times been, a resident of Los Angeles, California. He is a Creator and social media influencer who runs a YouTube channel called TechSource with 3.88 million followers.

8.      Defendant Rakuten USA, Inc., is a Delaware corporation, with its principal place of business in San Mateo, California.

9.      Defendant Ebates Performance Marketing, Inc., is a Delaware corporation, with its principal place of business in San Mateo, California.

10.     Rakuten USA, Inc. and Ebates Performance Marketing, Inc. share the same corporate headquarters address in San Mateo, California.

11.     Upon information and belief, Ebates Performance Marketing, Inc. does business as Rakuten Rewards and is a wholly owned subsidiary of Rakuten USA, Inc.

12.     Upon information and belief, both defendants are jointly and severally liable for the conduct alleged herein and acted in concert and as agents for one another in taking the actions giving rise to liability herein.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367.

14.     This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Class (defined below) exceeds $5,000,000, and at least one member of the Class is a citizen of a State different from that of Defendant.

15.     This Court has personal jurisdiction over Defendant because Defendant's principal place of business is in San Mateo, California, and Defendant conducts significant operations in this District.

16.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1), (b)(2), and (b)(3).

## FACTUAL BACKGROUND

**A.      Affiliate Marketing**

17.    An affiliate marketing strategy is based on a formation of partnership between a merchant-partner (*i.e.*, an online merchant) and an affiliate-partner (*i.e.*, a Creator). Merchants set up affiliate programs, which offer Creators the opportunity to sign up to promote merchants' products in exchange for affiliate commissions paid by merchants to Creators based on each sale a Creator generates.

18.    Merchants can set up affiliate programs on their own or with the help of an affiliate network – a third party that acts as an intermediary between merchants and Creators and facilitates their partnerships.

19.    Affiliate networks facilitate the partnerships between merchants and Creators by connecting merchants with Creators, generating unique affiliate links for Creators to share with their audiences, and tracking clicks, conversions, and sales generated by the Creators.

20.    Affiliate marketing programs are designed to increase traffic to merchants' websites and promote product sales by leveraging influence of individuals who have built social media accounts with large numbers of followers/subscribers and who have built trust and credibility with their audiences over time.

21.    Affiliate marketing programs are intended to compensate Creators only when their advertisement or promotion of products causes a subscriber/consumer to take action to purchase a product on the merchant's website.

22.    Accordingly, Creators earn commissions, payable by the merchant directly or through the affiliate network, when the following sequence of events occurs: (1) the Creator promotes a product, (2) a consumer clicks on an affiliate link on the Creator's webpage or social media platform and is directed to the merchant's website, and (3) the consumer places an item in the cart and completes the checkout process.

23.    Merchants' obligation to pay commissions is tracked (by the merchant or affiliate networks) primarily through the use of the affiliate links.

24.    The affiliate links contain a unique identifier assigned by the merchant or an affiliate network to a Creator. When a consumer clicks on an affiliate link, a cookie – a collection of data that associates information with a given Creator – is placed on their browser, which merchants and

affiliate networks use to confirm that a consumer was directed to the merchant's website from a specific Creator.

25.     A cookie usually expires after a certain period of time (*e.g.*, 14 or 30 days), which means that if the user engages with the merchant website and completes a transaction at a later time within the set time period, the merchant and/or affiliate network determines – based on the data in the cookie – which Creator, if any, should be credited with the sale and receive the commission.

26.     The Rakuten browser extension is available to consumers for free to download and use.

27.     It can be downloaded from the Chrome Web Store and many other web browser stores, including Firefox, Microsoft Edge, and Safari.

28.     Defendant advertises Rakuten as an extension that promotes savings by providing users with "Cash Back," stating on its website that "[w]e'll find you deals on more brands, apps and services so you can shop easy."  Rakuten further states on its website that "how" it is able to provide cash back is that "[s]tores pay us for sending them shoppers and we share that cash with you."  Rakuten also tells customers in its advertisements in the Chrome Store that Rakuten will "[a]utomatically apply the best coupons" so customers can "[s]pend [their] time shopping, not deal-hunting."  The effect of these statements is to suggest to customers that if customers were led to the merchant by a Creator (not by Rakuten), stores would not pay Rakuten.

29.     What Defendant does not tell consumers is that Rakuten steals commissions from Creators by replacing the Creators' information with Defendant's in cookies that are used to track and attribute commissions just as consumers are about to complete their purchases.

30.     Thus, Rakuten uses millions of its unwitting subscribers to perpetrate a huge scam against Creators.

31.     Here is how Rakuten works to steal Creators' commissions:

(a)     A user clicks on an affiliate link to a product provided by the Creator, which directs the user to a merchant's website. Once the user is on the merchant's website, the affiliate source information (*i.e.*, a unique code identifying the Creator as the one who sent the user to the merchant's website) is kept and tracked in a cookie.

1              (b)      For example, when a user clicks on an affiliate link

2 ([https://rstyle.me/+b53UfQ624OYQnUmFG1CqIQ](https://rstyle.me/+b53UfQ624OYQnUmFG1CqIQ)) on the YouTube video

3 ([https://www.youtube.com/watch?v=wdAJEjCPTGs](https://www.youtube.com/watch?v=wdAJEjCPTGs)), the user's web browser is redirected to

4 [https://bananarepublicfactory.gapfactory.com/browse/product.do?pid=8147070012500&locale=en_](#)

5 [US&irgwc=1&clickid=UmfU1dQ%3AOxyKWVFWv5zthU2YUksxXcTr0wemzQ0&ap=6&**tid=b**](#)

6 [**faf4441350**&siteID=bfafcid627443#pdp-page-content](#).

7              (c)      In this URL, the affiliate information is stored in the tid query parameter,

8 which indicates the affiliate ID (4441350).

9              (d)      When this URL loads in the user's web browser, the affiliate information is

10 also stored in a cookie named PARTNER whose value is

11 "35|||**bfaf4441350**|||6|||1737338626879|||20250119|||null|||null|||".



26              (e)      The user adds a product to their cart. If a user has downloaded the "Rakuten:

27 Get Cash Back For Shopping" extension, the extension shows a pop-up that invites the user to click

28 on the "Activate Cash Back" to "Get 2% Cash Back!".

1  //



(f)    Whether or not the Rakuten extension finds any discounts, when the consumer clicks on the popup, Rakuten removes the Creator's unique information in the cookie and replaces it with its own information.

(g)    Specifically, when the user clicks on the button, Rakuten's browser extension injects source code in the user's browsers that opens a merchant webpage at https://bananarepublicfactory.gapfactory.com/?rgwc=1&clickid=UmfU1dQ%3AOxyKWVFWv5zt hU2YUksxX4XG0yrZVM0&ap=6&**tid=bfaf46157**&siteID=bfafcid660836 in the background to replace the Creator's promo code stored in the cookie with its own promo code.

(h)    The source code injected by Rakuten's browser extension then reloads the merchant's website and updates the PARTNER cookie's value to "35|||**bfaf46157**|||6|||1737338859454|||20250119|||null|||null|||". Thus, the affiliate information stored in the cookie was changed from **bfaf4441350** to **bfaf46157**.

//



32.     By replacing Creators' information in cookies with Rakuten's information, Defendant is able to pocket the commission money from the merchant and/or affiliate network by taking advantage of the "last-click attribution" industry standard.

33.     The "last-click attribution" is a system whereby the affiliate who was the last to refer a customer to a merchant's website before the customer clicked to purchase a product is credited with the commission.

34.     Defendant's scheme to steal Creators' commissions is deceptive, unfair, and unlawful.  Rakuten is not a "party" to the affiliate marketing strategy, nor does it promote the product, but it swoops in at the last minute to get the "last click" by manipulating cookies to collect commissions which should have been attributed to Creators who did the work to promote the products.

35.     As a direct result of Defendant's actions, Plaintiff and Class Members regularly lose commissions which they earn, and which rightfully belong to them.

**C.     Plaintiff's Experience**

36.    Plaintiff Oganesyan runs a YouTube channel called TechSource that has 3.88 million followers. TechSource is dedicated to technology-related content, focusing on PC hardware reviews, custom PC builds, gaming and workstation setups and makeovers, and reviews on a wide range of tech products. TechSource regularly partners with merchants either directly or through third party affiliate networks to promote products on Plaintiff's YouTube channel and to drive sales through affiliate links.

37.    Plaintiff has devoted tremendous effort and time to build his YouTube channel and continuously devotes time and effort to researching and trying out new products before deciding whether to promote them on his platform. Plaintiff and other Creators depend on commissions from merchants and/or affiliate networks for their livelihood.

38.    Over the past several years, Plaintiff noticed that his revenue from commissions had dropped, despite his viewership having increased. Plaintiff found this to be odd. He was not aware of the Rakuten scam until January 2025.  As discussed above, the Rakuten commissions diversion scam was discovered after the Honey scam was revealed in December 2024 and spurred investigation into other similar shopping extensions.

39.    Upon information and belief, Plaintiff has been damaged by Rakuten's interception and manipulation of his affiliate source information that resulted in Rakuten diverting commissions to itself that Plaintiff rightfully earned.

**TOLLING OF STATUTE OF LIMITATIONS, CONCEALMENT, AND ESTOPPEL**

40.    Each unauthorized diversion of Plaintiff's and Class Members' commissions is a separate unlawful act that triggers anew the relevant statute of limitations.

41.    Additionally, any applicable statutes of limitation have been tolled by: (1) the fraudulent concealment doctrine based on Defendant's knowing and active concealment of the facts alleged herein including but not limited to its removal of Plaintiff's and Class Members' information in cookies and replacement of that information in cookies with its own, while representing to Plaintiff and Class Members, through Defendant's advertisements, that merchants only pay Rakuten when it "send[s] … shoppers" to the merchant; and (2) the delayed discovery doctrine, as Plaintiff and Class Members did not and could not reasonably have discovered

Defendant's conduct alleged herein until shortly before the filing of this Complaint.

42.    The tools embedded in the Rakuten extension that allow it to track consumers' shopping activity and manipulate affiliate source information are hidden from view. Creators have no way of knowing that the Rakuten extension manipulates their affiliate source information in cookies.  Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

43.    Plaintiff and Class Members were unaware of the information essential to pursue their claims, without any fault or lack of diligence on their part.

44.    All applicable statutes of limitation have also been tolled pursuant to the discovery rule.

45.    The earliest that Plaintiff and Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been on December 21, 2024, following the airing of the exposé by YouTuber MegaLag.

<strong>CLASS ACTION ALLEGATIONS</strong>

46.    Plaintiff, on behalf of himself and all others similarly situated, seeks relief under Federal Rules of Civil Procedure, Rule 23, on behalf of the following Class and Subclass (the "Class" or "Class Members"):

47.    <u>Nationwide Class</u>: All persons in the United States who have participated in an affiliate commission program with a United States online merchant and had their commissions diverted to Defendant via the Rakuten browser extension.

48.    <u>California Subclass</u>: All persons in California who have participated in an affiliate commission program with a United States online merchant and had their commissions diverted to Defendant via the Rakuten browser extension.

49.    Excluded from the Class and California Subclass are Defendant, their employees, agents and assigns, and any members of the judiciary to whom this case is assigned, their respective court staff, the members of their immediate families, and Plaintiff's counsel.

50.    Plaintiff reserves the right to revise or amend the above Class or California Subclass definition based on the discovery of new information.

51.    Numerosity (Rule 23(a)(1)): The potential members of the proposed Class and California Subclass as defined and identified herein, number, on information and belief, in the tens of thousands, and are so numerous and geographically dispersed that joinder of all members of the Class is impracticable.

52.    Typicality (Rule 23(a)(3)): Plaintiff's claims are typical of the claims of the Class and California Subclass. Plaintiff is, and has been during the relevant period, a participant in affiliate commission programs with at least one United States online merchant and, upon information and belief, has had his commissions diverted by Defendant through the use of the Rakuten browser extension.

53.    Commonality (Rule 23(a)(2)): Common questions of fact and law exist as to all Class Members and California Subclass Members and predominate over the questions affecting only individual members of the Class. With respect to the Class Members and California Subclass Members these common questions include but are not limited to:

a.    Whether Defendant's Rakuten extension was designed to systematically divert commissions that were earned by Creators;

b.    Whether Defendant obtained express consent to or authorization for its conduct;

c.    Whether Defendant's acts and practices violated the Electronic Communications Privacy Act 18 U.S.C. § 2510 *et seq*.;

d.    Whether Defendant's acts and practices violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030;

e.    Whether Defendant's acts and practices violated Cal. Bus. & Prof. Code § 17200 *et seq*.;

f.    Whether Defendant's acts and practices violated the California Invasion of Privacy Act, Cal. Penal Code § 630 *et seq*.;

g.    Whether Defendant's acts and practices violated the Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502;

h.    Whether Defendant's commission diversion scheme is unfair;

i.   Whether Defendant's commission diversion scheme is unlawful;

j.   Whether Defendant was unjustly enriched;

k.   Whether Defendant's acts and practices harmed Plaintiff, Class Members, and California Subclass Members;

l.   Whether Plaintiff, Class Members, and California Subclass Members are entitled to damages and other monetary relief, including restitution, and if so, what the appropriate measure of damages or other monetary relief is;

m.   Whether Plaintiff, Class Members, and California Subclass Members are entitled to declaratory relief and/or injunctive relief to enjoin the unlawful conduct alleged herein; and

n.   Whether Plaintiff, Class Members, and California Subclass Members are entitled to reasonable attorneys' fees and costs.

54.   Adequacy of Representation (Rule 23(a)(4)): Plaintiff will fairly and adequately protect the interests of the Class and California Subclass. Plaintiff's interests do not conflict with those of the Class, Plaintiff is not subject to unique defenses, and Plaintiff has retained competent and experienced counsel who have experience in complex consumer protection class action cases, as well as sufficient financial and legal resources to prosecute this case on behalf of the Class. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and California Subclass. Plaintiff and counsel anticipate no difficulty in managing the litigation of this case as a class action.

55.   Predominance and Superiority (Rule 23(b)(3)): In addition to satisfying the prerequisites of Rule 23(a), Plaintiff satisfies the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual members of the Class and California Subclass, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. Here, common issues predominate because liability can be determined on a class-wide basis even if some individualized damages determination may be required. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense

presented by complex legal and factual issues of the case to all parties and the court system. Furthermore, the expense and burden of individual litigation make it impossible for Class Members and California Subclass Members to individually redress the wrongs done to them, and individual Class Members and California Subclass Members do not have a significant interest in controlling the prosecution of separate actions. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court. If this action is not certified as a class action, it will be impossible as a practical matter for many or most Class Members and California Subclass Members to bring individual actions to recover money from Defendant due to the relatively small amounts of such individual recoveries relative to the costs and burdens of litigation. Plaintiff anticipates no difficulty in the management of this action which would preclude its maintenance as a class action.

56.     Plaintiff reserves the right to add representatives for the Class and California Subclass, provided Defendant is afforded an opportunity to conduct discovery as to those representatives.

## FIRST CAUSE OF ACTION
### Violation of the Computer Fraud and Abuse Act
### 18 U.S.C. §§ 1030, et seq.
### (By Plaintiff on behalf of himself and the Class)

57.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

58.     The Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4), makes it unlawful to: "knowingly and with intent to defraud, access[] a protected computer without authorization, or exceed[] authorized access, and by means of such conduct further[] the intended fraud and obtain[] anything of value…"

59.     18 U.S.C. § 1030(g) provides a private right of action to "[a]ny person who suffers damage or loss by reason of a violation of this section[.]"

60.     Consumers' computers are used in interstate and foreign commerce or communication.

61.     Defendant violated § 1030(a)(4), by knowingly, and with intent to defraud Plaintiff and Class Members, accessing cookies on consumers' browsers containing Plaintiff's and Class Members' data, via the Rakuten extension, and altering that data without authorization or by exceeding authorized access, and by means of such conduct furthering the intended fraud and obtaining commissions earned by Plaintiff and Class Members.

62.     Defendant's access was without authorization or in excess of authorized access, because the purpose of the access was to enact a commission diversion scheme, whereby Defendant surreptitiously used consumers' computers to defraud Plaintiff and Class Members by altering Plaintiff's and Class Members' data to steal their commissions.

63.     Plaintiff and Class Members have suffered damage and loss, aggregating at least $5,000 in value in any 1-year period during the relevant period, including, without limitation, their earned commissions, as a result of Defendant's violation of 18 U.S.C. § 1030.

64.     Defendant's unlawful access to and theft of Plaintiff's and Class Members' commissions through unauthorized access of the data on consumers' computers caused Plaintiff and Class Members irreparable injury. Unless restrained and enjoined, Defendant will continue such acts. Plaintiff's and Class Members' remedies at law are not adequate to compensate them for these threatened injuries, entitling Plaintiff and Class Members to remedies including injunctive relief as provided by 18 U.S.C. § 1030(g).

65.     Plaintiff, on behalf of himself and the Class, seeks relief as further described below.

### SECOND CAUSE OF ACTION
**Violation of California's Unfair Competition Law (UCL)**
**Cal. Bus. & Prof. Code §§ 17200 et seq.**
**(By Plaintiff on behalf of himself and California Subclass Members)**

66.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

67.     The UCL prohibits unfair competition in the form of any unlawful, unfair, or fraudulent business act or practice.  California Business & Professions Code § 17204 allows any "person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL.

68.     Defendant's acts, omissions, practices, and non-disclosures as alleged herein constitute unlawful and unfair business acts and practices within the meaning of Cal. Bus. & Prof. Code § 17200 *et seq*.

69.     The UCL draws upon various sources of law to establish regulations and standards for business practices within California. Defendant has engaged and continues to engage in business acts and practices that are unlawful because those practices violate federal and state laws, including the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq*., the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*., the California Invasion of Privacy Act, Cal. Penal Code § 630 *et seq*., and the Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502, as set forth in this complaint.

70.     Defendant's acts and practices are also "unfair" in that they are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to Plaintiff and Subclass Members. Defendant covertly accessed and misused Plaintiff's and Subclass Members' affiliate source information by replacing it with their own data, with no corresponding benefit to Plaintiff and Subclass Members. Because Defendant's Rakuten extension was installed on consumers' browsers and the Rakuten extension acted in a covert manner, Plaintiff and Subclass Members could not have avoided the harm.

71.     Defendant should be required to cease its unfair and/or illegal interception, use, and manipulation of Plaintiff's and Class Members' communications and information. Defendant has reaped and continues to reap unjust profits and revenues in violation of the UCL at the expense of Plaintiff and Class Members.

72.     "Actions for relief" under the UCL may be brought "by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204.

73.     Plaintiff has suffered injury in fact and has lost money or property as a result of Defendant's acts and practices because he lost commissions that rightfully belonged to him as the party whose marketing and efforts drove consumers to merchants' websites to purchase products.

74.     To protect Plaintiff and Class Members from Defendant's unfair and/or unlawful

practices, Plaintiff seeks an order from this Court enjoining Defendant from unlawfully intercepting and manipulating Plaintiff's and Class Members' affiliate source data.

75.    Plaintiff lacks an adequate remedy at law because the ongoing harms from Defendant's actions and practices must be addressed by public injunctive relief and, due to the ongoing nature of the harm, the harm cannot be adequately addressed by monetary damages alone.

76.    This action, if successful, will enforce an important right affecting the public interest and would confer a significant benefit on the general public. Private enforcement is necessary and places a disproportionate financial burden on Plaintiff in relation to Plaintiff's stake in the matter. Because this case is brought for the purpose of enforcing important rights affecting the public interest, Plaintiff also seeks the recovery of attorneys' fees and costs under Cal. Code of Civil Procedure § 1021.5 and other applicable law.

77.    Plaintiff seeks relief as further described below.

### THIRD CAUSE OF ACTION
**Restitution and Unjust Enrichment**
**(By Plaintiff on behalf of himself and the Class)**

78.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

79.    Through its commission diversion scheme, as described above, Defendant receives a benefit, in the form of commissions for sales that were not generated by its referral or advertisement, but by the referrals, efforts, or advertisements of influencers, bloggers, and other content creators unrelated to Defendant.

80.    In light of Defendant's conduct, it would be unjust for Defendant to retain the benefits it obtained from merchants and affiliate networks in the form of commissions it surreptitiously diverted from influencers, bloggers, and other content creators (*i.e.*, Plaintiff and Class Members).

81.    Defendant has been unjustly enriched by the payment of diverted commissions and should be required in equity to make restitution of these payments to the influencers, bloggers, and other content creators from whom they were diverted.

82.    Plaintiff, on behalf of himself and the Class, seeks relief as further described below.

## FOURTH CAUSE OF ACTION
### Intentional Interference with Contractual Relations
### (By Plaintiff on behalf of himself and the Class)

83.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

84.     Plaintiff and Class members had and have valid and enforceable contractual agreements with online merchants to promote products and services in exchange for commissions.

85.     Defendant knew of these contractual relationships, and Defendant intentionally interfered with them by replacing code in affiliate link cookies to disrupt the contractual relationship and to cause online merchants to pay to Rakuten commissions that the online merchants had agreed to pay to Plaintiff and the Class.

86.     Defendant caused Plaintiff and the Class to be deprived of the commissions they had earned under their contractual agreements with online merchants.  As a direct and proximate result, Plaintiff and the Class suffered economic harm.   Plaintiff, on behalf of himself and the California Class, seeks relief as further described below.

## FIFTH CAUSE OF ACTION
### Interference with Prospective Economic Advantage
### (By Plaintiff on behalf of himself and the Class)

87.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

88.     Plaintiff and Class Members were enjoying and continue to enjoy economic relationships with merchants and/or affiliate networks whereby Plaintiff and Class Members refer their followers to the merchants' websites by advertising merchants' products to the audiences on their social media accounts. In return, the merchants, directly or through affiliate networks, pay Plaintiff and Class Members commissions on sales they generate.

89.     Defendant knew and continues to know that an economic relationship exists between Plaintiff and Class Members, on the one hand, and merchants and/or affiliate networks, on the other hand.

90.     Defendant intentionally and unlawfully interfered with and disrupted, and continues to interfere with and disrupt, that economic relationship via the Rakuten extension, which intercepts

COMPLAINT

and manipulates affiliate source codes that Plaintiff and Class Members provide to merchants and/or affiliate networks, for the purpose of sale and commission attribution. As alleged above, the Rakuten extension offers the potential to customers to save money on their purchases by applying coupons, and at the same time works in the background to remove the Plaintiff's and Class Members' affiliate source information from the tracking cookie and replaces it with its own information. This removal and replacement of Plaintiff's and Class Members' data in the cookies results in commissions generated by Plaintiff and Class Members being diverted to Defendant.

91.     Plaintiff and Class Members were harmed by Defendant's actions in that they were deprived of their earned commissions.

92.     Plaintiff, on behalf of himself and the Class, seeks relief as further described below.

### SIXTH CAUSE OF ACTION
**Conversion**
**(By Plaintiff on behalf of himself and the Class)**

93.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

94.     Plaintiff and other Class Members had the right to commissions they earned from online merchants by referring customers to merchants' websites.

95.     Defendant intentionally and substantially interfered with Plaintiff's and Class Members' personal property by diverting commissions to themselves via the Rakuten extension. Such commission should rightfully have gone to Plaintiff and Class Members.

96.     Defendant's diversion and taking of Plaintiff's and Class Members' rightfully earned commissions was done without authorization.

97.     Plaintiff's and Class Members' rightful commission sums diverted by Defendant to itself are specific sums capable of identification.

98.     Defendant's actions have deprived Plaintiff and Class Members of their rightful commissions, causing them significant economic harm.  Plaintiff and Class Members lost income they would have otherwise received but for Defendant's wrongful conduct.

99.     Plaintiff, on behalf of himself and the Class, seeks relief as further described below.

### SEVENTH CAUSE OF ACTION

**Violation of the California Comprehensive Computer Data Access and Fraud Act**
**Cal. Penal Code § 502**
**(By Plaintiff on behalf of himself and the California Subclass)**

100.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

101.    Penal Code § 502(c)(1) makes it an offense when a person: "Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data."

102.    Defendant violated § 502(c)(1) when it accessed Plaintiff's and California Subclass Members' affiliate source information from the tracking cookie in order to replace it with their own information and thereby defraud and deceive or wrongfully obtain money or property belonging to Plaintiff and California Subclass Members.

103.    Cal. Penal Code § 502(c)(4) makes it an offense when a person: "Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network."

104.    Defendant violated § 502(c)(4) when it accessed Plaintiff's and California Subclass Members' affiliate source information from the tracking cookie and without permission deleted Plaintiff's and California Subclass Members' affiliate source information from the tracking cookie, added Rakuten information to the tracking cookie, and thereby altered and destroyed data belonging to Plaintiff and California Subclass Members.  In so doing, Defendant injected source code to overcome technical barriers to such deletion and alteration of affiliate source information.

105.    Penal Code § 502(e)(1) provides a private right of action for "the owner or lessee of the … data who suffers damage or loss by reason of a violation of any of the provisions of subdivision (c)[.]"

106.    Plaintiff and California Subclass Members were the owners of the data who suffered damage or loss as a result of Defendant's conduct. Defendant's acts and practices have deprived Plaintiff and California Subclass Members of their ability to receive their commissions.

107.    Plaintiff, on behalf of himself and the California Subclass, seeks compensatory damages in accordance with Cal. Penal Code § 502(e)(1) in an amount to be proved at trial, as well as injunctive or other equitable relief.

108.    Plaintiff and California Subclass Members have also suffered irreparable and incalculable harm and injuries from Defendant's violations. The harm will continue unless Defendant is enjoined from further violations of this section. Plaintiff and Class Members have no adequate remedy at law.

109.    Plaintiff and California Subclass Members are also entitled to punitive or exemplary damages pursuant to Penal Code § 502(e)(4) because Defendant's violations were willful and, upon information and belief, Defendant is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294. Plaintiff and California Subclass Members are also entitled to recover their reasonable attorneys' fees under § 502(e)(2).

110.    Plaintiff, on behalf of himself and the California Subclass, seeks relief as further described below.

### PRAYER FOR RELIEF

111.    WHEREFORE, Plaintiff prays for relief and judgment as follows:

a.    An order appointing Plaintiff as the Class Representative;

b.    An order certifying the Class and California Subclass as requested and appointing the undersigned attorneys as Class Counsel.

c.    An order declaring that Defendant's conduct violates the laws referenced herein;

d.    An order awarding actual, statutory, punitive, consequential damages in an amount to be determined at trial;

e.    An injunction forbidding Defendant from intercepting and manipulating affiliate links in a manner that diverts commissions to Defendant for sales they did not generate;

f.    Disgorgement of all ill-gotten profits and restitution of all revenues obtained from Plaintiff and Class Members as a result of Defendant's unfair and unlawful conduct;

g.    An award of reasonable attorneys' fees and costs of suit, as provided by

law.

h.    An award of pre- and post-judgment interest as provided by law; and

i.    An award of such other and further relief, at law and in equity, as the nature of this case may require or as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of himself and all other members of the Class and California Subclass, hereby demands a jury trial on all issues so triable.


DATED:  February 13, 2025            THE JHAVERI-WEEKS FIRM, P.C.


                                     By:  /s/ William C. Jhaveri-Weeks
                                        William C. Jhaveri-Weeks
                                        Sarah Abraham
                                        Ally N. Girouard


                                     HAMMONDLAW, P.C.

                                        Julian Hammond
                                        Polina Brandler
                                        Ari Cherniak

                                     *Attorneys for Plaintiff*