United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EDGAR OGANESYAN, et al.,
Plaintiffs,
v.
RAKUTEN USA, INC., et al.,
Defendants.

Case No. 25-cv-01534-HSG

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**

Re: Dkt. No. 65

Pending before the Court is Defendant's motion to dismiss the Consolidated Class Action Complaint (the "CAC"), Dkt. No. 60, for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6). Motion to Dismiss ("Mot."), Dkt. No. 65. The Court found this matter appropriate for disposition without oral argument and the matter was deemed submitted. Civil L.R. 7-1(b); Dkt. No. 80. The Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion to dismiss.

## I. FACTUAL ALLEGATIONS

Plaintiffs are creators who earn commissions by promoting products and services with specific website links that, when used by online customers, enable merchants to credit a creator with a particular sale. CAC ¶¶ 2, 20–43. This is accomplished using tracking software such as "cookies": when a customer clicks on a referral link, data is placed on the customer's web browser identifying the creator associated with the link. *Id.* Cookies are not permanent and can be replaced, such as by clicking on a subsequent referral link before completing a purchase. CAC ¶ 44. Creators enter into contracts with merchants defining their rights and responsibilities with respect to their commissions. CAC ¶¶ 31–35, 50–52, 120–54, 189, 195–96.

Defendant Ebates Performance Marketing, Inc. d/b/a Rakuten Rewards operates the Rakuten Browser Extension (the "Extension"), which searches for available coupons while a customer is online shopping. CAC ¶¶ 1, 11, 60–68. Customers do not interact with the Extension until they are already on a merchant's checkout page. CAC ¶¶ 66–68, 74. At that point, if a coupon is offered and the customer clicks the button "Apply Coupons," the Extension opens a hidden separate browser tab that refreshes the merchant's webpage, which causes Defendant's commission tracking cookie to displace any previously-stored cookies related to the pending transaction. CAC ¶¶ 67–88, 102, 238–39.

Defendant moves to dismiss the CAC arguing that: (1) Plaintiffs lack Article III standing; and (2) the CAC fails to state a claim for relief.

## II. LEGAL STANDARDS

Rule 12(b)(1) motions to dismiss challenge a federal court's subject matter jurisdiction. Article III courts have "limited jurisdiction" and presume "that a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). The party invoking federal jurisdiction bears the burden. *Id.* The issue of Article III standing is jurisdictional and "properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1)." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) (citations omitted). The applicable standard turns on the form of a defendant's jurisdictional argument. In a "facial" challenge, the defendant asserts that the complaint's allegations "are insufficient on their face" to allege standing, *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004), meaning that the court confines its analysis to the complaint, assumes the allegations are true, and draws all reasonable inferences in the plaintiff's favor, *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004) (overruled on other grounds). "[T]he *Iqbal* pleading standards" "apply in assessing the facial adequacy" of standing allegations. *Jones v. L.A. Cent. Plaza LLC*, 74 F.4th 1053, 1056 & n.1 (9th Cir. 2023) (*citing Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)) (citations omitted). Conversely, "factual" challenges dispute "the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air*, 373 F.3d at 1039. As such, the court "need not presume the truthfulness of the plaintiff's allegations"

and "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Wood v. City of San Diego*, 678 F.3d 1075, 1083 n.8 (9th Cir. 2012) (quotation omitted).

Rule 12(b)(6) motions to dismiss challenge the adequacy of a plaintiff's pleadings. Rule 8(a)(2) requires the complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal under Rule 12(b)(6) "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (quotation omitted). A plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to" the plaintiff, *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008), but do not accept the complaint's "legal conclusions" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," *Iqbal*, 556 U.S. at 678–79; *Khoja*, 899 F.3d at 1008 (quotation omitted).

## III. DISCUSSION

### a. Rule 12(b)(1) Motion to Dismiss

Plaintiffs plausibly allege Article III standing so as to survive Defendant's Rule 12(b)(1) challenge.

Article III standing exists when: (i) a plaintiff "suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) [] the injury was likely caused by the defendant; and (iii) [] the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation omitted). The injury in fact inquiry asks whether the plaintiff was harmed in a legally cognizable manner. An injury is "concrete" when it is "real, and not abstract," grounded in a "traditionally recognized" basis for suit in American courts. *Id.* at 424–25. Injuries must also be "particularized," rather than "generalized," which means that the injury must have

affected "the plaintiff in a personal and individual way." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1, 575 (1992). And the injury must be "actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal quotations omitted). But an injury in fact is not enough to plead Article III standing: a plaintiff must also allege that its injury in fact is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party." *Id.* (internal quotations omitted and cleaned up).

Defendant raises a facial standing challenge to this Court's jurisdiction based on the facts as pled, rather than by attempting to introduce extrinsic evidence undercutting those alleged facts. Mot. at 7; *see Safe Air*, 373 F.3d at 1039. Therefore, the Court accepts the facts in the CAC as true and draws all reasonable inferences in Plaintiffs' favor. *Wolfe*, 392 F.3d at 362.

The Court does not understand Defendant to contest that a person's loss of a lawfully owed monetary commission would be a concrete and particularized, non-generalized injury in fact that could be remedied by court order. *See TransUnion*, 594 U.S. at 423–25; Mot. at 1–2, 7–16; Reply ("R."), Dkt. No. 67 at 1–6 & 5 n.1; *cf.* Opposition ("Opp."), Dkt. No. 66 at 6. Rather, Defendant argues that: (1) Plaintiffs fail to plead the third prong of the injury in fact inquiry requiring an "actual" harm in the form of commissions improperly paid to Defendant rather than Plaintiffs; and (2) even if they did so allege, that injury would not be causally traceable to the Extension. *Id.* Plaintiffs counter that the alleged contract terms, an example checkout flow, and statistical data together plausibly establish actual harm traceable to the Extension. Opp. at 6–12; Sur-Reply ("SR."), Dkt. No. 75 at 1–4.

The parties dispute in reply and sur-reply the relevance of a then-newly issued decision by another judge in this district granting with leave to amend a motion to dismiss for lack of standing on purportedly similar facts. R. at 1–6; SR. at 1–4 (*discussing Wendover Prods., LLC v. PayPal Inc.*, No. 24-cv-09470-BLF, 2025 WL 3251667 (N.D. Cal. Nov. 21, 2025) ("*PayPal* I")). That court went on to deny a subsequent motion to dismiss regarding an amended complaint, holding that the plaintiffs had remedied the standing issues. *Id.*, 2026 WL 1799239 (N.D. Cal. June 22,

United States District Court
Northern District of California

2026) ("*PayPal* II"); *see* Dkt. No. 84.[1]

1. Actual Injury In Fact

Defendant argues that Plaintiffs do not plausibly allege an "actual" injury in fact because they have not pled entitlement to any commissions credited to Defendant. Mot. at 7–16; R. at 1–8. The Court disagrees.

Each Plaintiff alleges that they "entered into contractual agreements" with merchants that entitle them to the commissions at issue in this case. CAC ¶¶ 31–35, 50–52, 120–54, 189, 195–96. Bringing these allegations out of the realm of bare legal assertions, the CAC pleads the particulars of two such contracts for Plaintiff Just Josh. For one contract, the terms plausibly entitle Just Josh to commissions for online sales "made via the intentional click by a customer of a Qualifying Link that can be tracked and reported on through the use of Impact's tracking technology." CAC ¶ 51. Another of Just Josh's contracts is more specific, instructing that his commissions will accrue once there is a sale to "a customer within the relevant cookie window after the customer has initially entered [the Walmart] Site" so long as the customer does not "re-enter" the site through another link, and specifically prohibits the practice of "cookie stuffing." CAC ¶¶ 51–52, 95–104. While the Court "may resolve contractual claims on a motion to dismiss if the terms of the contract are unambiguous," *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 878–79 (N.D. Cal. 2018) (*citing Bedrosian v. Tenet Healthcare Corp.*, 208 F.3d 220, 220 (9th Cir. 2000) (unpublished)), the inquiry here is whether the pleadings plausibly allege a construction that is reasonable, leaving an actual merits determination to a later stage. *See Wiwynn Corp. v. X. Corp.*, No. 24-cv-05322-AGT, 2025 WL 409388, at *1–2 (N.D. Cal. Jan. 31, 2025) (*citing Sisley v. Spirit Commc'ns Co.*, 284 F. App'x 463, 466 (9th Cir. 2008)); *Yearby v. Am. Nat'l Ins. Co.*, No. 20-cv-09222-EMC, 2021 WL 3855833, at *16–17 (N.D. Cal. Aug. 30, 2021); *accord PayPal II*, 2026 WL 1799239, at *5; *In re RetailMeNot Extension Litig.*, 825 F. Supp. 3d 329, 342, 351 (S.D.N.Y. 2026). Though Defendant argues that "last click" really means "final click," at this stage what

[1] Plaintiffs also filed a statement of recent decision regarding *Ahntourage Media LLC v. Klarna, Inc.*, No. 25-cv-00124-MHW, 2026 WL 879716 (S.D. Ohio Mar. 31, 2026). *See* Dkt. No. 83.

matters is whether Plaintiffs' interpretation is reasonable. Mot. at 7–16; R. at 1–8. Drawing reasonable inferences in Plaintiffs' favor, these specific contract terms plausibly allege that Just Josh is entitled to commissions based on a definition of "last click" triggered by when a customer "has initially entered" the relevant merchant's site. CAC ¶¶ 51–52. Further, given that each Plaintiff is alleged to have such contracts, each Plaintiff sufficiently pleads actual harm for standing purposes at this stage. CAC ¶¶ 31–35, 50–52, 120–54, 189, 195–96; *accord PayPal II*, 2026 WL 1799239, at *4–5; *Ahntourage Media LLC v. Klarna, Inc.*, No. 25-cv-00124-MHW, 2026 WL 879716, at *1, 4 (S.D. Ohio Mar. 31, 2026); *In re Capital One Fin. Corp.*, No. 25-cv-00023-AJT, 2025 WL 1570973, at *3, 5 (E.D. Va. June 2, 2025); *cf. PayPal I*, 2025 WL 3251667, at *3.

Defendant's arguments with respect to actual injury in fact would impose a higher burden on Plaintiffs than is required at the pleading stage. Courts must be careful not to equate "weakness on the merits with absence of Article III standing," *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015) (quotation omitted), by "conflat[ing] the ultimate merits question . . . with the threshold standing determination," *Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 911 n.5 (9th Cir. 2011). The issue of what, if anything, Plaintiffs' contracts actually entitle them to is one of the key questions to be determined in the case.[2]

2. <u>Traceable Causation</u>

Defendant contends that Plaintiffs fail to plausibly plead causation traceable to the Extension. Mot. at 7–12; R. at 1–6. The Court disagrees.

Defendant overstates Plaintiffs' pleading burden with respect to causation as well. This is not summary judgment when "a party can no longer rest on mere allegations, but must set forth specific facts" supporting causation. *California v. Texas*, 593 U.S. 659, 675 (2021) (quotation omitted and cleaned up). Instead, at this stage, "specific facts plausibly explaining causality" are enough. *Barnum Timber Co. v. U.S. E.P.A.*, 633 F.3d 894, 899 (9th Cir. 2011). The existence of

---

[2] Subject matter jurisdiction is reassessed throughout the litigation. *U.S. v. $1,106,775.00 in U.S. Currency*, 177 F.4th 986, 992 (9th Cir. 2026) (*quoting Lujan*, 504 U.S. at 561). If further development of the record undermines Plaintiffs' initial showing of standing, Defendant may renew their challenge at summary judgment.

third-party conduct within a casual chain is not dispositive. *California*, 593 U.S. at 675. Rather, causation is established when a plaintiff plausibly alleges that "third parties will likely react in predictable ways" with respect to the theory of causation alleged. *Id.* (quotation omitted). In this case, Plaintiffs adequately plead Article III causation.

The CAC demonstrates how the Extension is plausibly causally responsible for Plaintiffs' actual injury in fact by referencing checkout screenshots. Specifically, the screenshots reflect that referral tracking is affected by a customer's use of the Extension after the customer arrives at a merchant's website through a creator's referral link. When the customer proceeds through the checkout process for a creator-referred computer mouse *without* interacting with the Extension, the merchant's website logs the creator's commission tracking code, resulting in earnings tied to that sale. CAC ¶¶ 54–59 & Images 1–4. But when the same mouse is purchased by first using the creator's link and then applying an Extension-supplied coupon, the Extension replaces the creator's commission tracking code with Defendant's information, resulting in "no commission" being awarded to Just Josh. CAC ¶¶ 89–91, 102 & Images 10–16. Accepting these facts as pled, the CAC alleges how the Extension causes Just Josh not to receive origination credit—and thus, his cash payment—for directing customers to merchants' websites.

The CAC alleges causation as to the remaining Plaintiffs by plausibly pleading that the checkout screenshots represent the standard checkout flow for all Plaintiffs. CAC ¶¶ 54–91, 102. Further, the CAC pleads that it is a "near statistical certainty" considering relevant context that "third parties [have] likely react[ed]" to the Extension "in predictable ways" by using the Extension after arriving at a merchant's webpage through a referral link, resulting in a redirected commission. *California*, 593 U.S. at 675 (quotation omitted); *see* CAC ¶¶ 31–35, 50–59 & Images 1–4; 89–91, 102 & Images 10–16; 105–9, 120–54, 189, 195–96, 238–39. Finally, this case is backward looking in part. This means that some facts in the causal chain are pled and accepted as having already occurred, including customers having downloaded the Extension for use in online transactions. CAC ¶¶ 60–65; *cf. FDA v. All. for Hippocratic Medicine*, 602 U.S. 367, 390–91 (2024). In combination, these facts plausibly allege traceable causation. *Accord PayPal II*, 2026 WL 1799239, at *5–6; *RetailMeNot*, 825 F. Supp. 3d at 344; *Capital One*, 2025

WL 1570973, at *6.

Defendant's self-inflicted harm argument misses the mark. Mot. at 11–12; R. at 4–5. Traceable causation arises "even if the injury could be described in some sense as willingly incurred." *FEC v. Cruz*, 596 U.S. 289, 296–97 (2022) (citation omitted). The Supreme Court has "never recognized a rule" rejecting standing under these circumstances, and explicitly declined "to recognize an exception" for "injuries that a party purposely incurs." *Id.* An injury is "self-inflicted" and problematic for standing purposes only where a plaintiff undertook an action but cannot show that it "had been or [was] likely to be subjected to" the purportedly violative policy or conduct. *See id.* (*citing Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402, 416 (2013) (discussing plaintiffs employing protective measures fearing a federal surveillance program they were not actually subject to)); *Int'l Partners for Ethical Care Inc. v. Ferguson*, 146 F.4th 841, 848–49 (9th Cir. 2025) (discussing parents changing their parenting style in light of a statute not governing their conduct). But here, the CAC pleads through the screenshots showing the two alternative checkout paths that Plaintiffs unquestionably were subjected to the allegedly unlawful conduct: the Extension rerouting Plaintiffs' commissions. *Cruz*, 596 U.S. at 297; CAC ¶¶ 31–35, 50–59 & Images 1–4; 89–91, 102 & Images 10–16; 105–9, 120–54, 189, 195–96, 238–39. At bottom, there is no disqualifying self-inflicted wound for causation purposes when Defendant's "purportedly unlawful conduct . . . is the but-for cause of any injury to Plaintiffs." *Capital One*, 2025 WL 1570973, at *5 n.12; *accord RetailMeNot*, 825 F. Supp. 3d at 341–44.

Plaintiffs plausibly allege Article III standing and survive Defendant's Rule 12(b)(1) challenge. Defendant's motion to dismiss on this ground is **DENIED**.

**b. Rule 12(b)(6) Motion to Dismiss**

Plaintiffs plausibly allege most of their claims so as to survive Defendant's Rule 12(b)(6) challenge, but fail with respect to some.

1. <u>Unjust Enrichment and Restitution</u>

Count 1 alleges unjust enrichment and seeks restitution. CAC ¶¶ 171–83. Arizona, California, Colorado, Florida, and Kentucky require proof that Defendant received and unjustly retained a benefit at Plaintiffs' expense, and an inadequate remedy at law. *See City of Oakland v.*

United States District Court
Northern District of California

*Oakland Raiders*, 83 Cal. App. 5th 458, 477–78 (2022); *accord Freeman v. Sorchych*, 226 Ariz. 242, 251 (Ct. App. 2011); *Scott v. Scott*, 428 P.3d 626, 636 (Colo. App. 2018); *Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So. 3d 689, 693 (Fla. Dist. Ct. App. 2018); *Furlong Dev. Co. v. Georgetown-Scott Cnty. Plan. & Zoning Comm'n*, 504 S.W.3d 34, 39–40 (Ky. 2016).

Defendant argues that it did not receive any benefit from Plaintiffs, and that any benefit Defendant received is proper because it also provides merchants a service or otherwise contractually earned the commissions at issue. Mot. at 12–17, 20–21; R. at 8–9.

These arguments fail to construe the allegations in Plaintiffs' favor. This action is not about how the Extension generally purportedly provides a service to merchants. The CAC alleges that Plaintiffs earned commission payments at the time that they brought customers to merchants' websites, and that the Extension knowingly diverted the benefits and resulting commissions to Defendant. CAC ¶¶ 31–35, 50–59 & Images 1–4; 89–91, 102 & Images 10–16; 105–9, 120–54, 189, 195–96, 238–39; *see Capital One*, 2025 WL 1570973, at *7.

In characterizing the contracts at issue, Defendant essentially asks this Court to draw disputed inferences in its favor. But each Plaintiff plausibly alleges entitlement to the commissions at issue through specifically pled contractual terms with merchants, for the same reasons that Plaintiffs plausibly allege standing. *See* Order § III(a)(1); CAC ¶¶ 31, 51–52, 120–54. Drawing reasonable inferences in Plaintiffs' favor, these contract terms plausibly allege that Plaintiffs are entitled to commissions based on a definition of "last click" triggered by when a customer "has initially entered" the relevant merchant's site. *Id.*; *compare PayPal I*, 2025 WL 3251667, at *5 *with PayPal II*, 2026 WL 1799239, at *13.

The alleged benefit conferred to Defendant is Plaintiffs' referral of customers whose purchases resulted in origination credit and payments allegedly misattributed to Defendant, and the attendant injustice is Defendant's retention of that money. *See id.*; *accord Klarna*, 2026 WL 879716, at *8; *Capital One*, 2025 WL 1570973, at *7–8. To that end, Plaintiffs properly invoke this Court's equitable jurisdiction by seeking an injunction as well as non-duplicative disgorgement of ill-gotten profits, which may differ from and be greater than the amounts Plaintiffs would recover in the form of the referral fees established in their merchant contracts.

*See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020); CAC ¶ 183 & at 62; Opp. at 22–23; SR. at 4; *see also* Order § III(b)(5); *accord PayPal II*, 2026 WL 1799239, at *14.

Plaintiffs plausibly state a claim for unjust enrichment under Arizona, California, Colorado, Florida, and Kentucky common law. Defendant's motion to dismiss this claim is **DENIED**.

2. Business Torts

Count 2 alleges interference with prospective economic advantage. CAC ¶¶ 184–91. Arizona, California, Colorado, Florida,[3] and Kentucky recognize this tort, generally requiring proof of: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship[;]" "(4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Golden Eagle Land Inv., L.P. v. Rancho Santa Fe Assn.*, 19 Cal. App. 5th 399, 429–30 (2018) (emphasis removed) (internal quotations omitted) (also requiring "wrongful" conduct); *accord Edwards v. Anaconda Co.*, 115 Ariz. 313, 315–16 (Ct. App. 1977) (also requiring "improper" conduct); *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 500 (Colo. 1995) (also requiring "improper" conduct); *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814–15 (Fla. 1994) (*quoting Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985)); *Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 6 (Ky. Ct. App. 2012).

Count 3 alleges intentional interference with contract. CAC ¶¶ 192–97. Arizona, California, Colorada, Florida, and Kentucky recognize this tort, generally allowing "a stranger to a contract" to be liable "in tort for intentionally interfering with the performance of the contract"

[3] Contrary to Defendant's unsupported assertion, Florida appears to recognize a tort akin to interference with prospective economic advantage. *Compare* Mot. at 21 n.12 & R. at 10 n.6 *with Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814–15 (Fla. 1994) (noting that "[i]n Florida, a plaintiff may properly bring a cause of action alleging tortious interference with present or prospective customers" called "tortious interference with a business relationship," with substantively the same elements and not requiring "an enforceable contract") (*quoting Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985)); *accord St. Johns River Water Mgmt. Dist. v. Fernberg Geological Servs., Inc.*, 784 So. 2d 500, 504 (Fla. Dist. Ct. App. 2001).

with proof of: "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148 (2004) (quotation omitted); *accord Wells Fargo Bank v. Ariz. Labs., Teamsters & Cement Masons Loc. No. 395 Pension Tr. Fund*, 201 Ariz. 474, 493–94 (2002) (also requiring "improper" conduct); *Krystkowiak v. W.O. Brisben Cos.*, 90 P.3d 859, 871 & n.13 (Colo. 2004) (also requiring "improper" conduct); *Farah v. Canada*, 740 So. 2d 560, 561 (Fla. Dist. Ct. App. 1999) (quotation omitted); *Snow Pallet*, 367 S.W.3d at 5–6.

The core elements in dispute for these claims are whether Plaintiffs had either economic or contractual relationships with merchants, and whether Plaintiffs pled injuries to those economic relationships or contracts. Mot. at 17–18, 21–22; R. at 10.

Defendant's argument regarding the existence of economic relationships or valid contracts between Plaintiffs and merchants fails for the same reason that Plaintiffs' unjust enrichment claim is well-pled. The alleged contract terms on their face plausibly allege ongoing and future economic relationships and contracts between Plaintiffs and merchants entitling Plaintiffs to commissions where customers "ha[ve] initially entered" relevant merchants' sites through Plaintiffs' referral links, notwithstanding customers' subsequent interactions with the Extension. *See* Order § III(b)(1). Further, the CAC pleads facts regarding Defendant's intentional conduct concerning the Extension's design and operation, including Defendant receiving contemporaneous information about the tracking data that the Extension replaces with Defendant's code. CAC ¶¶ 20–36, 69–88 & Images 6–9, 238–39. This is sufficient to generally plead intent and knowledge, particularly where Defendant receives commissions through the same tracking-based method of attribution. *Id.* Finally, the CAC plausibly alleges independent "wrongful" conduct under California's rule. *See Golden Eagle*, 19 Cal. App. 5th at 429–30; *Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688, 713 (2007) (noting that an act is "independently wrongful if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard") (internal quotations omitted); Order § III(b)(1), (4)-(5). The same is true with

respect to "improper" conduct under Arizona and Colorado's rules, given the nature of Defendant's allegedly covert conduct, intentional design of the Extension, and the economic interest in preserving contractual relations in the affiliate market. *See Wells Fargo*, 201 Ariz. at 494; *Krystkowiak*, 90 P.3d at 871 n.13; CAC ¶¶ 20–36, 69–88 & Images 6–9, 238–39.

Defendant's motion overstates what Plaintiffs must reasonably allege with respect to interference with these economic and contractual relationships. For Count 3, Plaintiffs need not plead, as Defendant suggests, that Plaintiffs' contracts were terminated. Mot. at 22. Rather, the CAC pleads that the Extension caused merchants' "actual [contract] breach" by improperly causing payment to Defendant rather than Plaintiffs. *Reeves*, 33 Cal. 4th at 1148; CAC ¶¶ 31–35, 50–59 & Images 1–4; 89–91, 102 & Images 10–16; 105–9, 120–54, 189, 195–96, 238–39. As for Count 2, Plaintiffs need not plead that, for example, they have been unable to enter into additional agreements. Mot. at 22. Interference with prospective economic advantage is a sister tort that provides "broader . . . protect[ion] against intentional acts designed to harm an economic relationship" than Count 3's intentional interference with contract. *Shamblin v. Berge*, 166 Cal. App. 3d 118, 122–23 (1985). Here, economic relationships were disrupted by non-payment of accrued commissions. It need only be "reasonably *probable* that the lost economic advantage would have been realized but for the defendant's interference," and the CAC plausibly alleges the specific causal mechanism by which Defendant actually receives commissions that would otherwise go to Plaintiffs. *Youst v. Longo*, 43 Cal. 3d 64, 71 (1987) (emphasis in original); CAC ¶¶ 31–35, 50–59 & Images 1–4; 89–91, 102 & Images 10–16; 105–9, 120–54, 189, 195–96, 238–39; *accord PayPal II*, 2026 WL 1799239, at *11–13; *Capital One*, 2025 WL 1570973, at *8–10.

Plaintiffs plausibly state claims for interference with prospective economic advantage and intentional interference with contract under Arizona, California, Colorado, Florida, and Kentucky common law. Defendant's motion to dismiss these claims is **DENIED**.

3. Conversion

Count 4 alleges conversion. CAC ¶¶ 198–202. Arizona, California, Colorado, Florida, and Kentucky recognize this tort, generally requiring proof of: "(a) plaintiff's ownership or right to possession of personal property, (b) defendant's disposition of property in a manner

inconsistent with plaintiff's property rights, [] (c) resulting damages" and (d) in some circumstances "a specific sum capable of identification." *Voris v. Lampert*, 7 Cal. 5th 1141, 1150–52 (2019) (quotations omitted); *accord Miller v. Hehlen*, 209 Ariz. 462, 472 (Ct. App. 2005) (also requiring proof of intent); *Mason v. Farm Credit of S. Colo., ACA*, 419 P.3d 975, 983 (Colo. 2018); *Glenn Arms Assocs. v. Century Mortg. & Inv. Corp.*, 680 P.2d 1315, 1317 (Colo. App. 1984) (requiring demand and refusal to return); *Hannah v. Malk Holdings, LLC*, 368 So. 3d 1087, 1091 (Fla. Dist. Ct. App. 2023) (also requiring proof of intent); *Ky. Ass'n of Cntys. All Lines Fund Tr. v. McClendon*, 157 S.W.3d 626, 632 n.12 (Ky. 2005) (also requiring proof of intent as well as demand and refusal to return).

Defendant argues that Plaintiffs have not alleged an ownership or possessory interest in their tracking codes and that no definite converted sum is identified. Mot at 18–19, 22–24, R. at 10–12.[4] Plaintiffs respond that their possessory interest arises from their co-creation of the tracking codes contained within the tracking cookies. Opp. at 16–18. The Court agrees with Defendant.

Plaintiffs have not alleged any facts plausibly pleading that they are the owners or have a possessory interest in the tracking codes at issue. To begin, asserting that Plaintiffs have a "right to possess" the tracking codes is simply an unsupported legal conclusion. CAC ¶ 199. The Court is left with allegations about how codes are associated with various creators, CAC ¶¶ 31–35, 41–45, and that Plaintiffs customize their codes, CAC ¶¶ 31–35, 117.

These are not plausible allegations of ownership or possession. Plaintiffs "[a]t most . . . allege that each tracking code is unique to [each Plaintiff], which suggests they may have some sort of interest in those tracking codes, but not plausibly an ownership or possessory interest."

---

[4] Given the defects in this claim identified in this Order, the Court need not address Defendant's argument that Plaintiffs fail to adequately plead "a specific sum capable of identification." *Voris*, 7 Cal. 5th at 1150–52 (quotations omitted). Should there be a second round of motion to dismiss briefing for the conversion claim, both parties must thoroughly address whether any sub-class state requires allegations of such a "specific sum," whether the property converted at issue is tangible or intangible, whether as Plaintiffs suggest intangible property is not subject to this rule under the relevant states' laws, Opp. at 17, and whether a claim can be stated in light of those rules. The Court notes that in *Welco Electronics, Inc. v. Mora*, the court addressed conversion of "the intangible property" of a credit card number and remarked that a "plaintiff must specifically identify the amount of money converted." 223 Cal. App. 4th 202, 216 (2014).

*Capital One*, 2025 WL 1570973, at *11. Even interpreting the CAC in Plaintiffs' favor, the CAC's allegations support the inference that tracking links and their related codes are issued by and under the control of *merchants*—not Plaintiffs. It is merchants who decide whether and when to enter into merchant-creator contracts and issue any referral codes, and each link only operates when included within a URL directing a customer to a merchant's website domain. CAC ¶¶ 31, 34, 38. The CAC also undermines Plaintiffs' claim of entitlement to "exclusive" or "immediate possession" of these codes by alleging that customers can use or delete cookies at will from their computers, or manipulate cookies by replacing one with another through use of a new referral link. *Holistic Supplements, LLC v. Stark*, 61 Cal. App. 5th 530, 552–53 (2021) (quotation omitted); *Farmers Ins. Exch. v. Zerin*, 53 Cal. App. 4th 445, 452 (1997) (quotation omitted) (emphasis removed); CAC ¶¶ 41–44, 210.

Contrary to Plaintiffs' claim, *Capital One* aligns with this conclusion. That court reasoned that for a property interest to exist under Virginia law with regard to the codes in that case, plaintiffs would at least likely need to plead contractual terms that defined ownership rights. *Compare* Opp. at 17 *with* 2025 WL 1570973, at *10–12. Plaintiffs have not done so here. Further, that court's discussion of a likely *necessary* prerequisite to ownership did not hold that pleading such facts would be *sufficient* to create a property interest, under Virginia law or otherwise. *Id.*

Defendant also argues that Plaintiffs fail to plead that they demanded return of the converted property and Defendant refused. This is fatal under at least Colorado and Kentucky law. *See* Mot. at 23 n.13; *Glenn Arms*, 680 P.2d at 1317; *McClendon*, 157 S.W.3d at 632 n.12.[5] Plaintiffs did not respond to this argument.

Finally, though not addressed by either party, at least Arizona appears to follow a version of the "merger doctrine" for conversion claims of intangible property.[6] *See Hehlen*, 209 Ariz. at

---

[5] Should there be a second round of motion to dismiss briefing for the conversion claim, both parties must thoroughly address whether any sub-class state imposes the demand and refusal requirement, and whether a claim can be stated in light of those rules.

[6] The Court assumes without deciding that the property at issue is intangible. *See* Order *supra* note 4.

United States District Court
Northern District of California

472. A conversion claim may lie where the intangible asset "is merged into, or identified with, some document" such that the conversion analysis focuses on the merged document itself. *Id.* This may prove to be another hurdle for this claim should it be repleaded. *See RetailMeNot*, 825 F. Supp. 3d at 352–54; *Capital One*, 2025 WL 1570973, at *10–11.[7]

Plaintiffs have not plausibly stated a claim of conversion. Defendant's motion to dismiss this claim is **GRANTED** with leave to amend.

4. Computer Fraud Claims

Count 5 alleges a violation of the federal Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(4). CAC ¶¶ 203–16; Opp. at 18. It is unlawful to "knowingly and with intent to defraud, access[] a protected computer without authorization, or exceed[] authorized access, and by means of such conduct further[] the intended fraud and obtain[] anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period," and a person may bring suit where they have suffered "damage or loss." 18 U.S.C. § 1030(a)(4), (c)(4)(A)(i)(I), (g). Under the CFAA, "damage" is "any impairment to the integrity or availability of data, a program, a system, or information," and "loss" is "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information" as well as "any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1310(e)(8), (11). Thus, CFAA claims cannot sound in purely "economic harm due to the commercial value of the data itself." *Ji v. Naver Corp.*, No. 21-cv-05143-HSG, 2023 WL 6466211, at *11 (N.D. Cal. Oct. 3, 2023) (quotation omitted).

Count 7 alleges a violation of California's Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502(c)(1). CAC ¶¶ 231–44; Opp. at 18. CDAFA makes it unlawful to "knowingly access[] and without permission alter[] . . . any data," providing

[7] Should there be a second round of motion to dismiss briefing for the conversion claim, both parties must thoroughly address whether any sub-class state relies on the merger doctrine or a similar rule, and whether a claim can be stated in light of those rules.

remedies to "the owner or lessee of the computer . . . or data." Cal. Pen. Code § 502(c)(1), (e)(1).

Defendant argues that Plaintiffs have not pled either unauthorized access or "damage or loss" under 18 U.S.C. § 1030(g), Mot. at 19, 24–27; R. at 12–14, and that the CDAFA claim fails for this and additional reasons, Mot. at 20, 29; R. at 15. The Court disagrees as to the CFAA, and agrees as to the CDAFA.

The CAC plausibly pleads the first CFAA element of unauthorized access. It alleges that the Extension surreptitiously replaces cookies on consumers' computers, and that "[c]ustomers do not expect the [Extension] to operate in this manner or to alter this data, and the extension's cookie-stuffing functionality is not disclosed in the applicable terms of service or privacy policy, or in any information that is disclosed to consumers who install the extension in the ordinary course." CAC ¶¶ 31–35, 50–59 & Images 1–4; 67–91, 102 & Images 10–16; 102, 105–9, 120–54, 189, 195–96, 212, 238–39; *accord PayPal II*, 2026 WL 1799239, at *9; *Klarna*, 2026 WL 879716, at *5.

Defendant argues that a subset of Plaintiffs agreed to August 2024 terms of service (the "August 2024 Terms of Service") authorizing the alleged conduct. Mot. at 19, 24–27; R. at 12–14. It appears undisputed that this argument does not apply to Plaintiffs who did not agree to the August 2024 Terms of Service. *See* Opp. at 19.

Plaintiffs are incorrect that the Court should disregard the August 2024 Terms of Service at the motion to dismiss stage under the incorporation by reference doctrine. *Cf. id.* On a motion to dismiss, courts generally do not consider extrinsic evidence, including evidence that "merely creates a defense." *Cottle v. Plaid Inc.*, 536 F. Supp. 3d 461, 475–78 (N.D. Cal. 2021) (*quoting Khoja*, 899 F.3d at 1002). But the August 2024 Terms of Service are not simply a basis for a defense here. Plaintiffs characterize the August 2024 Terms of Service, contending that they did "not disclose[]" how the Extension works and thus did not authorize the Extensions' access for CFAA purposes. CAC ¶ 212. Thus, the first element of unauthorized access for Plaintiffs' CFAA claim as currently pled "depends on the contents of" the August 2024 Terms of Service, because the claim hinges on whether customers authorized the Extension to operate as it did by consenting to the terms. *Id.*; *see Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (finding that

defamation claim was founded on contents of extrinsic document); *eBay Inc. v. Digit. Point Sols., Inc.*, 608 F. Supp. 2d 1156, 1164 (N.D. Cal. 2009) (remarking that "[a]llegations with respect to access and use beyond those set forth in a user agreement constitute unauthorized use under the CFAA") (citation omitted).

At this stage of the litigation, the August 2024 Terms of Service do not mandate dismissal. Contract interpretation is a legal question, so Plaintiffs' allegations couched as factual statements regarding what customers agreed to are not controlling. CAC ¶ 212. But again, the inquiry here is whether the pleadings plausibly allege a construction that is reasonable, leaving an actual merits determination to a later stage. Reading the pleadings in the light most favorable to Plaintiffs, the August 2024 Terms of Service are plausibly consistent with Plaintiffs' theory of the case. The August 2024 Terms of Service provide that when a customer arrives to a merchant's webpage through one of the Plaintiff's referral links and then subsequently decides to use the Extension, Defendant "will not automatically overwrite those cookies" already left in place by the Plaintiff's link. Mot. at 27. One reasonable reading of that contract clause is that because the Extension is not responsible for "automatically" overwriting existing cookies, it falls to the customer to decide whether to "manually" clear their cookies to restart the accreditation tracking process. CAC ¶ 210 (noting that "an ordinary computer owner can see that tracking codes are installed and can delete them"). That is enough for Plaintiffs who purportedly agreed to the August 2024 Terms of Service to survive this motion.[8] Defendant's "resort to such extensive contract parsing is unpersuasive at the motion to dismiss stage" where ambiguities are resolved in Plaintiffs' favor, not Defendant's. *PayPal II*, 2026 WL 1799239, at *5 (citation omitted); *see Wiwynn*, 2025 WL 409388, at *1–2 (*citing Sisley*, 284 F. App'x at 466); *Yearby*, 2021 WL 3855833, at *16–17; *accord RetailMeNot*, 825 F. Supp. 3d at 342, 351.

Turning to the second CFAA element of pleading damage or lost service revenue because of interrupted service, the CAC plausibly pleads that the Extension overwrites the tracking cookies, destroying that data and replacing it with Defendant's code, which prevents merchants

[8] And again, it appears undisputed that this argument does not apply to Plaintiffs who did not agree to the August 2024 Terms of Service. *See* Opp. at 19.

from relying on that information to properly attribute referrals. 18 U.S.C. § 1310(e)(8), (11); CAC ¶¶ 60–91. Regarding "damage," "technological harms—such as the corruption of files" in the form of "impairment to the integrity or availability of data . . . or information" is sufficient. *Van Buren v. U.S.*, 593 U.S. 374, 391–92 (2021) (*quoting* 18 U.S.C. § 1030(e)(8)); *Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 894–95 (N.D. Cal. 2010). And here, as alleged, the data relied on by merchants to properly attribute referral credit was not just corrupted, but made "[un]available" through deletion and replacement. *Id.*; *see PayPal II*, 2026 WL 1799239, at *10; CAC ¶¶ 31–35, 50–59 & Images 1–4; 89–91, 102 & Images 10–16; 105–9, 120–54, 189, 195–96, 238–39. The authorities that Defendant cites for the proposition that the data at issue has no independent value are distinguishable, as those cases addressed data that did not have a particularized associated monetary value. Mot. at 25 (*citing Cottle*, 536 F. Supp. 3d at 471, 485–86 (regarding loss of indemnification rights and opportunity to sell data, and attendant privacy concerns); *Doe v. Cnty. of Santa Clara*, No. 23-cv-04411-WHO, 2024 WL 3346257, at *1, 9 (N.D. Cal. July 8, 2024) (regarding communications involving personal health information)).

A "loss" of revenue through an "interruption of service" is also plausibly pled. Defendant's contention that there was no service interruption because communication between "the website [and] the server" was not interrupted is unpersuasive. Mot. at 25. The CFAA generally and the "loss" subsection specifically are concerned both with protecting computers' communication processes and averting "harm to computer data" conveyed through those processes. *Van Buren*, 593 U.S. at 391 (*citing* 18 U.S.C. § 1030(e)(11)); *Integrity Applied Sci., Inc. v. Clearpoint Chems. LLC*, No. 18-cv-02235-DDD, 2020 WL 12584444, at *2 (D. Colo. Apr. 20, 2020) (finding service interruption where recipient of information was switched for another). Further, Defendant tries to rewrite the CAC in claiming that the Extension does not "redirect[]" customers. Mot. at 25. The CAC pleads, and the Court accepts as true, that the Extension "redirects the consumer's browser to a purpose-built" webpage "hidden from the customer" which "enables the Extension to replace the affiliate tracking codes." CAC ¶¶ 67–88, 102, 238–39. A service interruption is thus plausibly pled both as to the transmission process itself and the underlying cookie data communicated from customers' computers to merchants. CAC ¶¶ 31–35,

50–59 & Images 1–4; 89–91, 102 & Images 10–16; 105–9, 120–54, 189, 195–96, 238–39; *accord PayPal II*, 2026 WL 1799239, at *11; *Klarna*, 2026 WL 879716, at *5; *Capital One*, 2025 WL 1570973, at *12.

Finally, Defendant argues with respect to the CDAFA that the terms of service authorized the Extension's conduct, and that Plaintiffs do not plead CDAFA's purported additional element of "without permission," which Defendant claims requires conduct "overcom[ing] technical or code-based barriers." Cal. Pen. Code § 502(c)(1); *see* Mot. at 20, 29; R. at 15 (*quoting In re iPhone Application Litig.*, No. 11-MD-02250-LHK, 2011 WL 4403963, at *12 (N.D. Cal. Sept. 20, 2011)). The Court disposed of Defendant's first argument in the earlier CFAA analysis. Regarding the second point, multiple decisions from California district courts have held that the "without permission" requirement "is not limited in this manner," and neither party adequately addressed Defendant's argument specifically or the case law's purported tension generally.[9] *Zarif v. Hwareh.com, Inc.*, 789 F. Supp. 3d 880, 899 (S.D. Cal. 2025) (collecting cases) (quotation omitted). But there is a fatal problem with this claim not addressed by either parties' moving papers: to recover, a plaintiff must be "the *owner* or lessee of the computer . . . or data." Cal. Pen. Code § 502(e)(1) (emphasis added). For the reasons stated regarding the dismissed conversion claim, Order § III(b)(3), Plaintiffs have not plausibly pled ownership of the data in question and therefore fail to state a claim under the CDAFA. *Accord RetailMeNot*, 825 F. Supp. 3d. at 359; *Capital One*, 2025 WL 1570973, at *14.

Plaintiffs plausibly state a claim under the CFAA, but not the CDAFA. Defendant's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART** with leave to amend.

5. <u>State Unfair Competition Laws</u>

Count 6 alleges a violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq*. CAC ¶¶ 217–30. The UCL defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Each

---

[9] Should there be a second round of motion to dismiss briefing for the CDAFA claim, both parties must thoroughly address the meaning of "without permission" under Cal. Pen. Code § 502(c)(1), and whether a claim can be stated in light of that rule.

UCL prong establishes a separate theory of liability. *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1554–57 (2007). The UCL's "unlawful" prong permits a plaintiff to "borrow[] violations of other laws" and treat them as "independently actionable" unfair competition. *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (internal quotations omitted). Private civil actions are limited to the equitable remedies of injunctive relief and restitution. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003) (citations omitted). While the federal rules allow plaintiffs to pursue "alternative remedies at the pleadings stage," *Collyer v. Catalina Snacks Inc.*, 712 F. Supp. 3d 1276, 1289 (N.D. Cal. 2024) (citations omitted), a plaintiff "must establish that she lacks an adequate remedy at law before securing equitable restitution for past harm under the UCL," *Sonner*, 971 F.3d at 844 (citations omitted).

Count 8 alleges a violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 *et seq.* CAC ¶¶ 245–55. The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[,]" and operates distinctly from the UCL. Fla. Stat. § 501.204(1); *Hilton v. Apple, Inc.*, No. 13-cv-07674-GAF, 2014 WL 10435005, at *5 (C.D. Cal. Apr. 18, 2014). "A consumer claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Parziale v. HP, Inc.*, 445 F. Supp. 3d 435, 442 (N.D. Cal. 2020) (quotation omitted). "An unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *In re Carrier IQ, Inc. Consumer Priv. Litig.*, 78 F. Supp. 3d 1051, 1119 (N.D. Cal. 2015) (internal quotations omitted). A deceptive act "occurs if there is a representation, omission, or practice that is likely to mislead consumers acting reasonably in the circumstances, to the consumers' detriment." *Id.* (internal quotations omitted).

As discussed in this Order, Plaintiffs have plausibly pled violations of law to ground a UCL unlawful prong claim. *Cel-Tech*, 20 Cal. 4th at 180. They have also alleged facts sufficient to invoke this Court's equitable jurisdiction. Plaintiffs seek an injunction and non-duplicative disgorgement of Defendant's ill-gotten profits, which may differ from and be greater than the

United States District Court
Northern District of California

amounts Plaintiffs would recover in the form of the referral fees established in their merchant contracts. *Sonner*, 971 F.3d at 844; CAC ¶ 183 & at 62; Opp. at 22–23; SR. at 4; *see also* Order § III(b)(1); *accord PayPal II*, 2026 WL 1799239, at *14. Defendant's citations to *Sonner* and *Capital One* are unpersuasive, given that Plaintiffs in this case have explained how equity may provide a greater recovery than what is available at law. *Id.*; *cf.* 2025 WL 1570973, at *16. And by its terms, *Sonner* applies to UCL claims for restitution, not prospective injunctive relief. 971 F.3d at 844; *accord Linton v. Axcess Fin. Servs., Inc.*, No. 23-cv-01832-CRB, 2023 WL 4297568, at *3 (N.D. Cal. June 30, 2023).

Finally, Plaintiffs plausibly plead a claim under FDUTPA. Plaintiff Brevard is a Florida-based company engaged in business in that state, and it alleges the same facts giving rise to the other Plaintiffs' claims for relief in this action. Brevard thus can raise a claim on behalf of the Florida sub-class. CAC ¶¶ 10, 248–53. And the allegations regarding the Extension's functionality discussed in this Order plausibly state that Defendant misled consumers, particularly in light of the Extension's allegedly hidden operations. *Carrier IQ*, 78 F. Supp. 3d at 1119; *Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. Dist. Ct. App. 2000) (citations omitted); CAC ¶¶ 31–35, 50–59 & Images 1–4; 67–91, 102 & Images 10–16; 102, 105–9, 120–54, 189, 195–96, 238–39.

Plaintiffs plausibly state claims under the UCL and FDUTPA. Defendant's motion to dismiss these claims is **DENIED**.

//

//

//

//

//

//

//

//

//

United States District Court
Northern District of California

## IV. CONCLUSION

Defendant's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**. Though the Court has identified deficiencies in the CAC, leave to amend should be granted unless it is clear "that the complaint could not be saved by any amendment." *Manzarek*, 519 F.3d at 1034 (internal quotations omitted). The Court cannot conclude at this point that amendment necessarily would be futile, so it grants leave to amend as to the dismissed claims. Plaintiffs may file an amended complaint within 21 days of the date of this Order, and may not add any new claims or defendants.

**IT IS SO ORDERED.**

Dated: 9/25/2026

Haywood S. Gill Jr.

HAYWOOD S. GILLIAM, JR.
United States District Judge